## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
**Newport News Division**

FILED

JUL -9 2014

CLERK, US DISTRICT COURT
NEWPORT NEWS, VA

JIMMIE L. BARROW
and
ELEANOR R. BARROW,

               Plaintiffs,

v.

BANK OF AMERICA, N.A.,
SERVE: CT Corporation System, Registered Agent
      4701 Cox Road, Suite 285
      Glen Allen, VA 23060

and

EXPERIAN INFORMATION SOLUTIONS, INC.,
SERVE:    David N. Anthony, Registered Agent
          Troutman Sanders, LLP
          1001 Haxall Point
          Richmond, VA 23219

and

TRANS UNION, LLC.,
SERVE:    Corporation Service Company, Registered Agent
          Bank of America Center 16th Floor
          1111 E. Main St.
          Richmond, VA 23219

and

EQUIFAX INFORMATION SERVICES, LLC.,
SERVE:    Corporation Service Company, Registered Agent
          Bank of America Center 16th Floor
          1111 E. Main St.
          Richmond, VA 23219

and

J.M. ADJUSTMENT SERVICES, LLC.,
SERVE:    Corporation Service Company, Registered Agent
          Bank of America Center 16th Floor
          1111 E. Main St.
          Richmond, VA 23219

               Defendants.

JURY DEMANDED

4:14 cv 87

## COMPLAINT

Plaintiffs, JIMMIE L. BARROW (hereafter "Plaintiff" or "Mr. Barrow") and ELEANOR R. BARROW (hereafter "Plaintiff" or "Mrs. Barrow"), by counsel, for their Complaint against Defendants, allege as follows:

### PRELIMINARY STATEMENT

1. This is an action for actual, statutory and punitive damages, costs and attorney's fees brought pursuant to 15 U.S.C. §§ 1681 *et seq*. (Federal Fair Credit Reporting Act or "FCRA"); 12 U.S.C. § 2601 *et seq*. (Real Estate and Settlement Procedures Act or "RESPA"); 15 U.S.C. §§ 1692 et seq. (Federal Fair Debt Collection Practices Act or "FDCPA"); and breach of contract for the implied covenant of good faith and fair dealing.

### JURISDICTION

2. The jurisdiction of this Court is conferred by the FRCA, 15 U.S.C. § 1681p, the RESPA, 12 U.S.C. §2605(f), the FDCPA 15 U.S.C. § 1692k(d) and 28 U.S.C. §1331.

3. This court also has jurisdiction over the state law claims by supplemental jurisdiction under 28 U.S.C. §1367.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as all of the Defendants maintain registered offices within the boundaries of the Eastern District of Virginia, Plaintiffs reside in this District and Division and significant part of the Plaintiff's claims occurred in Newport News, Virginia.

### PARTIES

5. The Plaintiff, JIMMIE L. BARROW is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c).

6. The Plaintiff, ELEANOR R. BARROW is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c).

7. Upon information and belief, BANK OF AMERICA, N.A., d/b/a BAC HOME LOAN SERVICING, LP ("Bank of America") is a foreign limited liability company doing business as a mortgage originator and servicer. At all relevant times hereto, Bank of America was a servicer under RESPA and furnisher as governed by the FRCA.

8. Upon information and belief, EXPERIAN INFORMATION SOLUTIONS, INC. ("Experian"), is a corporation authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia.

9. Upon information and belief, Experian is a "consumer reporting agency," as defined by 15 U.S.C. § 1681(f). Upon information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681(d) to third parties.

10. Upon information and belief, Experian disburses such consumer reports to third parties under contract for monetary compensation.

11. Upon information and belief, TRANS UNION, LLC. ("Trans Union") is a corporation authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia.

12. Upon information and belief, Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. §1681(f). Upon information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. §1681(d) to third parties.

13. Upon information and belief, Trans Union disburses such consumer reports to third parties under contract for monetary compensation.

14. Upon information and belief, EQUIFAX INFORMATION SYSTEMS, LLC. ("Equifax") is a corporation authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia.

15. Upon information and belief, Equifax is a "consumer reporting agency," as defined in 15 U.S.C. §1681(f). Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. §1681(d) to third parties.

16. Upon information and belief, Equifax disburses such consumer reports to third parties under contract for monetary compensation.

17. Upon information and belief, J.M. Adjustment Services, LLC., is a Michigan limited liability corporation with its headquarters at 16600 18 Mile Road, Clinton TWP MI 48038. J.M. Adjustment Services (JMA) is organized for the purpose of and regularly engages in the business of collection of debts owed or asserted to be owed to others. JMA uses the mails, interstate commerce, and even in-person encounters to

4

regularly collect or attempt to collect consumer debts in Virginia. JMA is a debt collector within the meaning of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692a(6).

18. JMA regularly meets face-to-face with homeowners on behalf of mortgage servicers such as Bank of America in order to extract money allegedly owed as debts to Bank of America from homeowners or in furtherance of foreclosure activity.

19. JMA promotes itself through a website newweb.jmadjustments.com. On its website, JMA states: "JMA is an industry-leading provider of face-to-face borrower communications with the scale, experience and performance to deliver impressive and demonstrable results."

20. Bank of America knows that JMA is a debt collector within the meaning of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692a(6).

## FACTS

21. Mr. and Mrs. Barrow have lived in their Newport News, Virginia home for more than 15 years.

22. Mr. and Mrs. Barrow are both retired and live on a fixed income.

23. On or about August 27, 2009, Mr. and Mrs. Barrow executed a Note in the principal sum of $193,947.00 and Deed of Trust secured by their primary residence and backed by the Federal Housing Administration ("FHA").

24. Bank of America is the mortgage servicer for the Barrow's mortgage.

25. Mr. Barrow and Mrs. Barrow are both senior citizens whose income consists solely of social security retirement benefits.

26. In 2011, the Barrows experienced financial hardship due primarily to medical expenses at the same time their monthly mortgage payments were to rise.

27. Mr. Barrow is 81 years old.  Mrs. Barrow is 78 years old.

28. On or about March 1, 2011, Mr. and Mrs. Barrow contacted Bank of America and submitted a completed Home Affordable Modification Program (HAMP) loan modification application.

29. At the time they applied for the loan modification under HAMP, they were current on their mortgage.

30. On or about March 16, 2011, Bank of America sent correspondence to Mr. and Mrs. Barrow informing them that the application they submitted was incomplete because "Borrower did not return all applicable financial documentation requested (Example:  Copy of the two most recent consecutive pay stubs covering 30 days for each borrower).

31. Mr. and Mrs. Barrow responded that they had provided proof of their only income, which was the monthly social security payments they received through an automated clearinghouse transfer to their bank account.

32. On or about March 23, 2011, Bank of America informed the Barrows that their application for a loan modification had been denied.

33. Mr. and Mrs. Barrow were current on their mortgage at the time Bank of America took the adverse action on their loan modification application.

34. Mr. and Mrs. Barrow immediately requested an appeal of the decision, but were told by Bank of America that they had to submit a new application for a loan modification.

35. On or about April 1, 2011, Mr. and Mrs. Barrow submitted a new loan modification application and re-submitted all the required documentation.

36. On or about April 15, 2011, Bank of America sent Mr. and Mrs. Barrow a package of information with an offer of an FHA Home Affordable Modification Trial Period Plan (FHA TPP), which was to commence with the first payment on June 1, 2011, with 4 payments of $1,263.12.

37. Mr. Barrow signed the FHA TPP on May 26, 2011, and Mrs. Barrow signed the FHA TPP and returned it on June 2, 2011. Because they did not return the FHA TPP until June 2, 2011, Mr. and Mrs. Barrow believed that they were not eligible to participate in the TPP. They did not receive an endorsed agreement back from Bank of America.

38. The Barrows made their next regular monthly mortgage payment in June, their total payment of $1348.55, was posted to their account on June 30, 2011.

39. The Barrows continued to make their mortgage payments on time and in full. Bank of America sent the July 1, 2011, mortgage statement on June 29, 2011, which had not accounted for the June payment that was posted on June 30, 2011, but which reflected $1296.68 was past due.

40. The Barrows continued to seek a loan modification, and continued to make their monthly mortgage payments on time and in full.

41. In approximately August of 2011, a representative from Bank of America told the Barrows that since they were paying their mortgage on time and in full, that they should stop making their mortgage payments until the processing of the modification application was complete.

42. The Barrows made their mortgage payment in July, August and September of 2011.

43. Based on the instructions by Bank of America, the Barrows feared that their loan modification application would be rejected if they continued to pay their mortgage, and so they followed the Bank of America instructions to stop paying their mortgage payment in October of 2011.

44. In November of 2011, the Barrows had not received any information from Bank of America concerning their loan modification application, and became concerned about withholding their mortgage payments.

45. On or about November 10, 2011, the Barrows began making their mortgage payments again.

46. On or about November 30, 2011, Bank of America sent a letter informing the Barrows that they were $2384.40 past due on the mortgage. The Barrows knew this was inaccurate amount.

47. On December 7, 2011, Bank of America sent a letter to the Barrows stating that the arrearage was now $4131.08 past due. The Barrows knew that this was an inaccurate amount.

48. Despite being told by Bank of America to stop paying their mortgage and despite the fact that Bank of America sent them at least two letters with inaccurate statements of arrearages, the Barrows proceeded to make their regular mortgage payments.

49. Instead of applying the amounts that the Barrows had paid to the mortgage according to the terms of the Deed of Trust, Bank of America put the payments into a suspense account.

50. On or about May 10, 2012, the Barrows received correspondence from a Bank of America customer relationship manager named Nancy Snodgrass, who provided the phone number 1-800-669-6650, where she could be reached directly. However, despite the Barrows' best efforts, Mrs. Snodgrass was rarely available, and when she did speak to them, she was unable to assist them with any questions concerning the accuracy of the loan accounting, the status of the loan modification.

51. The Barrows continued to make their mortgage payments on time and in full.

52. Bank of America continued to send the Barrows statements with escalating and incorrect amounts of money it claimed to be due and owing, including late fees and interest that were incorrect and improper. In December of 2012, Bank of America wrote to the Barrows stating that they owed $13,816.44.

53. On January 4, 2013, Mr. Barrow noticed that there was a woman in the yard taking pictures of his home. She left the property before he was able to go outside to speak to her. Mr. Barrow called Mrs. Snodgrass to find out what was going on, but despite many attempts over several days, Mrs. Snodgrass was unavailable to answer the phone and did not return his calls.

54. On January 9, 2013, Mr. Barrow was finally able to reach a Bank of America representative named Elizabeth. He requested information why he was receiving notices of arrearage when he was current on his mortgage. Elizabeth told him that his payments had been put into suspense because he had applied for a loan modification but could not explain why the loan had been reported as delinquent for over 12 months.

55. Mr. Barrow continued calling Bank of America representatives including Mrs. Snodgrass, Mandella Nancey, Ron Norman, Stacey Frisco, Jolie Jacobs, Rolene Clayton

and others, none of whom could explain what was happening with Mr. and Mrs. Barrow's mortgage or loan modification application.

56. This cycle repeated itself over the next fifteen months, with the Barrows making their mortgage payments and receiving varying incorrect statements of arrearages from Bank of America.

57. The Barrows were unable to obtain any satisfactory information from Bank of America, their customer relationship manager, or any decision on their loan modification application.

58. Upon information and belief, Bank of America knew that its handling of borrower loan modification applications, borrower documents, and borrower mortgage accounts was at a minimum, inaccurate, but more likely, incompetent and purposefully designed to cause acceleration and foreclosure, depriving borrowers of their rights and property even when borrowers were not delinquent or in default.

59. On March 7, 2013, the Barrows received a notice of intent to accelerate and foreclose, which falsely stated that the amount to reinstate the loan was $17,584.55, and the amount to cure the default was $5,345.46. This notice caused Mr. and Mrs. Barrow to experience anxiety, panic, confusion, helplessness. Mrs. Barrow experienced high blood pressure, which caused her to become severely ill. Not only was Mr. Barrow concerned about losing his home, he was now extremely stressed about losing his wife. This situation caused him to experience depression and stress.

60. On our about April 1, 2013, Mr. Barrow received a call from Bank of America, which left a message on their answering machine. When Mr. Barrow returned the call, he spoke to Stacey Frisco who stated that Mrs. Snodgrass was not their customer

relationship manager anymore. Mr. Barrow was referred to Mrs. Jolie Jacobs who stated that the Barrows were four months behind in their mortgage.

61. Mr. Barrow informed Mrs. Jacobs that he had proof of payments that demonstrated that he was current on his mortgage and that Bank of America was incorrect.

62. In approximately May 2013, Mr. and Mrs. Barrow each sent a Qualified Written Request (QWR) to Bank of America disputing the accuracy of the mortgage account, requested specific information about their mortgage to which they are entitled, and requesting that Bank of America correct its inaccurate accounting of the mortgage and end its collection attempts.

63. Instead of responding to the information requested by the Barrows, Bank of America simply replied with a loan history statement that did not address the inaccuracy of the information that they had received, the treatment of their loan modification, and incorrect arrearages.

64. On or about April 2, 2013, Bank of America transmitted a letter to the Barrows stating that their loan modification application was denied. It further stated that they were ineligible for FHA Home Retention Options. The only two options were a short sale or deed in lieu of foreclosure.

65. Between April 4, 2013, and April 10, 2013, the Barrows received several more letters, which all stated different, inaccurate arrearage amounts due and owing, when they were in fact current on their mortgage.

66. On April 10, 2103, after more than a year of frustration and stress, Mr. Barrow received a letter from Bank of America stating that the amount needed to bring the loan

current was $1804.01, but that it was not the amount needed to reinstate the loan or stop the acceleration date of April 16, 2013.

67. After reading that letter, Mr. Barrow wrote to Bank of America with a check for $3,768.12, which he believed included his current monthly mortgage payment, the $1804.01 Bank of America claimed was past due, and an additional $492.00.

68. Despite this payment, Bank of America continued to seek to collect amounts that the Barrows did not owe.

69. On or about April 27, 2013, Mr. and Mrs. Barrow obtained copies of their consumer reports.

70. Mr. Barrow's consumer report showed that Bank of America was falsely reporting that he had not made a mortgage payment since October of 2010.

71. Mrs. Barrow's consumer report showed that Bank of America was falsely reporting that she had not made a mortgage payment since October of 2010.

72. On May 11, 2013, the Barrows found a bright orange door hanger from Bank of America on the front door, which said it was important and that the Barrows needed to call Bank of America at 1-800-669-0102. The Barrows were at home at the time the door hanger was placed on the doorknob, but no one had knocked or attempted to ascertain if anyone was home. In fact, the visitor alighted and departed the porch before the Barrows could reach the door.

73. Mr. Barrow called the number on the door hanger, 1-800-669-6607, and spoke to someone called Jessica, who could not provide any information about the status of the Barrow's mortgage.

74. On our about May 13, 2013, the Barrows received a letter from Bank of America thanking them for participating in the home loan assistance process and that the Barrows would no longer have a dedicated customer relationship manager.

75. On or about May 14, 2013, we received a letter the name of a new customer service relationship manager, Bryan Maola, and information about several programs to help homeowners that are having trouble making monthly mortgage payments.

76. On or about May 21, 2013, the Barrows received a package from Bank of America dated May 17, 2013, and delivered by FedEx, which stated Bank of America would be sending a representative from JMA Services to their home to collect documents to review and for the purpose of providing the Barrows with loan assistance options.

77. The Barrows immediately called the number to dispute the alleged debt and to try to clear up the ongoing inaccuracies.

78. Upon information and belief, JMA is a third party debt collector. The May 17, 2013, letter stated that "Bank of America and JMA Services are debt collectors. However, the purpose of this communication is to let you know about your potential eligibility for this program to help you avoid foreclosure."

79. The Barrows felt that they could not trust anything said by Bank of America or JMA, given the monumental inaccuracies relating to their mortgage, the harmful advice concerning the loan modification applications, the notice of intent to accelerate, and the threats of foreclosure.  They believed it was no longer in their best interest to seek a modification since it had resulted in Bank of America seeking to foreclose despite the fact they were current on their mortgage.  They believed they were now just trying to keep from being wrongfully ousted from their home.

80. As of the date of this Complaint, JMA has not assisted the Barrows with loan assistance options, but instead has visited the Barrows home without making contact but leaving bright orange door hangers for the purpose of collecting money the Barrows do not owe, to intimidate them, and to cause them to fear foreclosure.

81. Upon information and belief, neither JMA nor Bank of America are seeking to assist the Barrows stay in their home, but instead are seeking to gain access to the Barrows for the purpose of collecting money from the Barrows and/or wresting them out of their home.

82. On or about May 22, 2013, a representative of Bank of America (believed to be JMA) went to the Barrows home. The Barrows were at home and saw someone approach the house. The person did not knock at the door, ring the doorbell, or otherwise announce their presence. The person simply taped a letter to the front door and left. The letter was unsigned, undated and indicated a representative had visited their home, but because they (the Barrows) were not at home during the representative's visit, it was up to the Barrows to call 855-562-2632. Nowhere on the door hanger was any information about JMA.

83. On or about May 23, 2013, the Barrows received a "Notice" that was dated a and mailed from zip code Clinton Township, MI on May 21, 2013, from JMA, which stated that it had made or attempted to make contact with the Barrows on behalf of Bank of America to encourage them to contact J.M. Adjustment Services, LLC and that it had to include legal disclosures that "seem odd and unsettling" and that "it may seem like we are asking you to pay off the loan, but we are not."

84. The Notice included a debt validation notice, stating the amount the Barrows owed was $183,269.12, but that the amount may vary from day to day due to interest and late charges and other charges; that the name of the creditor to whom the debt was owed is Bank of America; "Unless you, within thirty days after receipt of this letter, dispute the validity of the debt or any portion of the debt, J.M. Adjustment Services, LLC will assume the debt to be valid"; if the Barrows notified JMA that they disputed the debt at the address provided, JMA would obtain a verification of the debt; upon request within 30 days, JMA will provide the name and address of the original creditor.

85. The back of the Notice contained a paragraph that the communication if from a debt collector attempting to collect a debt, and any information obtained will be used for that purpose.

86. The Notice was confusing and designed to mislead the Barrows about the purpose of the letter, the purpose of JMA's attempt to communicate with the Barrows, the amount of the debt, the identity of the creditor to whom the alleged debt was owed, and furthermore was part of a campaign of communication with the Barrows meant to appear to comply with the FHA requirements that Bank of America have a face-to-face meeting with the Barrows before accelerating and foreclosing.

87. Upon information and belief, JMA visited the Barrows home and left bright orange door hangers without attempting to make any personal contact on several other occasions, including but not limited to: July 11 and August 15, 2013.

88. The Notice was a communication from a debt collector, JMA, to the Barrows which communication failed to make the disclosures required by 15 U.S.C. § 1962g.

89. The Notice does not contain the true identity of the creditor to whom the debt is owed.

90. The Notice does not contain the true amount of the purported debt.

91. The orange door hangers were placed in unsealed envelopes on the doorknob of the front door of the Barrow's home.

92. In addition to the date, the door hangers read: "IMPORTANT," "PLEASE CALL," "BOA," "1-800-669-0102," "PLEASE BE READY TO GIVE YOUR ACCOUNT NUMBER," "WE ARE EXPECTING YOUR CALL TODAY," "*CALLS ARE RANDOMLY MONITORED& RECORDED TO ENSURE QUALITY SERVICE."

93. Upon information and belief, it was JMA and not Bank of America that visited the Barrow's home and placed the door hanger on the doorknob.

94. The orange door hangers made none of the disclosures required by 15 U.S.C. § 1692e(11) disclosures.

95. JMA did not make any actual attempt to speak to the Barrows at any time that they went to the Barrow's home.

96. On or about July 12, 2013, Bank of America representative Stephanie Huckabee in Richmond, VA, contacted the Barrows. Ms. Huckabee informed Mr. Barrow that they had been in a loan modification since June of 2011, but that they voluntarily had opted out of it. Mr. Barrow informed Ms. Huckabee that this was untrue and that he had been attempting to get a loan modification since 2011, had submitted two applications, and had been attempting to communicate not only with his customer

relations manager but anyone at Bank of America who would provide customer service on their mortgage account and modification applications.

97. In addition, Mr. Barrow informed Ms. Huckabee that the current mortgage improperly included personal property tax, from which the Barrows had been exempt for over three years.

98. Four days later, the Barrows received another Notice of Intent to Accelerate, falsely stating that the Barrows owed $3,276.12.

99. On or about May 17, 2013, Mr. and Mrs. Barrow each sent a letter to Equifax, Trans Union and Experian, disputing the accuracy of their reporting the Bank of America mortgage on Mr. and Mrs. Barrow's individual consumer reports.

100.    Mr. Barrow supplied specific information each of the consumer reporting agencies that the delinquency being reported was inaccurate and provided proof of payments in all the months that each consumer reporting agency was reporting that no payment had been made.  The proof included copies of checks as well as the account history provided to Mr. Barrow by Bank of America.

101.    Mrs. Barrow supplied specific information each of the consumer reporting agencies that the delinquency being reported was inaccurate and provided proof of payments in all the months that each consumer reporting agency was reporting that no payment had been made.  The proof included copies of checks as well as the account history provided to Mr. Barrow by Bank of America

102.    Equifax, Trans Union and Experian all received the disputes.

103.    On May 31, 2013, Equifax sent to Mr. Barrow the results of his dispute investigation: "The status of this account has been updated.  The prior paying history on

this account has been updated.   Additional information has been provided from the original source regarding this item. If you have additional questions about this item please contact: Bank of America . . ."

104.   Equifax is still reporting inaccurate, derogatory payment history for Mr. Barrow, with 180 days or more past due, $1472.00 past due, and the account delinquent since September of 2011.

105.   On May 31, 2013, Equifax sent to Mrs. Barrow the results of the dispute investigation:  "The status of this account has been updated.  The prior paying history on this account has been updated.   Additional information has been provided from the original source regarding this item. If you have additional questions about this item please contact: Bank of America . . ."

106.   Equifax is still reporting inaccurate, derogatory payment history for Mrs. Barrow, with 180 days or more past due, $1472.00 past due, and the account delinquent since September of 2011.

107.   On June 2, 2013, TransUnion sent to Mr. Barrow the results of the dispute investigation: NEW INFORMATION BELOW.   Instead of correcting the inaccurate and derogatory information, TransUnion reported the account 120 past due, with a past due amount of $15,072.00, and that no payments had been received since September of 2011.

108.   On June 6, 2013, TransUnion sent to Mrs. Barrow the results of the dispute investigation: NEW INFORMATION BELOW.   Instead of correcting the inaccurate and derogatory information, TransUnion reported the account 120 past due, with a past due amount of $15,072.00, and that no payments had been received since September of 2011.

109.    On June 7, 2013, Experian sent to Mr. Barrow the results of the dispute investigation:  "We have reviewed the documentation you provided with your dispute, but have determined that we are not able to use it to make the changes or deletions you requested.  We are contacting the furnisher of the information or the vendor who collected the information from a public record source. When we complete our processing of your dispute, which may take up to 30 days, or up to 45 days for a disput of information in an annual free credit report) we will send you the results."  Mr. Barrow has never been informed by Experian the results of its investigation.

110.    On June 12, 2013, Experian sent to Mrs. Barrow the results of the dispute investigation: "Updated."

111.    Based on the same exact information that Mr. Barrow had provided to Experian, Experian "updated" Mrs. Barrow's report.  It still contained inaccurate, derogatory reporting including that she was 120 days delinquent on her mortgage, hadn't made a mortgage payment since September of 2011, and was $1472 past due as of April 2013.  Although the report includes account history that has dates of payment in the "DPR" (date payment received) category, the "AAP" (actual amount paid) contains no information.  Experian had enough information to correct or delete the negative and derogatory information, yet it did not.

112.    On or about May 17, 2013, both Mr. and Mrs. Barrow wrote to Bank of America to dispute the inaccurate and derogatory information on their consumer reports.

113.    On or about May 30, 2013, Bank of America acknowledged receipt of the dispute, and requested "patience while we research your request."

114.    Despite the disputes that Mr. and Mrs. Barrow sent to the consumer reporting agencies and directly to Bank of America, which included proof of payments and the Bank of America account history, the inaccurate and derogatory reporting remains on their consumer reports and Bank of America continues to try to collect money, fees and interest that the Barrows do not owe.

115.    On August 6, 2013, Mr. and Mrs. Barrow each sent to Bank of America a QWR requesting – among other things -- documentation regarding their loan, information about their escrow items, balance in suspense accounts since January 2011, and copies of all documents related to their requests for loan modifications.

116.    On or about August 27, 2013, Bank of America wrote to Mr. and Mrs. Barrow stating that it was responding to their correspondence of August 6, 2013, and to the extent it requested information under the Real Estate Settlement and Procedures Act (RESPA) those issues would be addressed separately in accordance with RESPA guidelines.

117.    The August 27, 2013, letter also stated "your remaining requests seem generally directed toward disavowing the enforceability of the loan documents you signed at closing. We did not find any facts in your letter that would reasonably support a claim that the loan documents signed at closing are not enforceable. . . . Other than the response to the valid QWRs in your letter, we decline to provide any further written response to your remaining requests at this time."

118.    Instead of providing information that they properly requested, the response identified GNMA1 BANA 2936 PLS as the investor, Bank of America, N.A., as the servicer, included a copy of the Note and the Deed of Trust.

119.    The Barrow's loan is insured by the Federal Housing Adminsitration (FHA). Their Note and Deed of Trust contracts prohibit acceleration and foreclosure unless the mortgagee follows certain federal regulations.

120.    Bank of America may not accelerate or initiate foreclosure without first taking specific actions to avoid unnecessary foreclosures, including conducting mandatory face-to-face meetings with the borrowers prior to acceleration.  The reason the FHA regulations require a face-to-face meeting with the borrowers is to discuss foreclosure avoidance.

121.    To date, neither Bank of America nor JMA have met with the Barrows or have made a good faith attempt to meet with the Barrows to avoid acceleration and foreclosure.  If they had, they would have learned of Bank of America's inexcusable errors related to the Barrow's mortgage, the mishandling of their loan modification applications, and their egregious error in attempting to collect what the Barrows do not owe.

122.    Upon information and belief, the purpose of JMA's false and misleading written communications were to create a paper trail of purported written documentation designed to support foreclosure filings that are made without first actually conducting the fact-to-face meetings mandated by the FHA regulations and the Supreme Court of Virginia.  Because of this, JMA's communications including the door hangers are intended to facilitate and obtain payments from the consumer in favor of the creditor.

## COUNT ONE: BREACH OF CONTRACT FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (BANK OF AMERICA)

123.   Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

124.   A covenant of good faith and fair dealing exists in every valid Virginia contract, including notes and deeds of trust pertaining to real property such as the note and deed of trust pertaining to Plaintiff's property. A breach of the covenant of good faith and fair dealing is a breach of the underlying contract.

125.   Bank of America failed to perform its duty of good faith and fair dealing with respect to each of the Plaintiffs by such actions as refusing to timely credit their payments to their mortgage account; for failing to accurately keep their account in order; improperly assessing default related charges when they were not in default; failing to abide by the terms of the Note and Deed of Trust that govern the original loan; failing to properly consider the loan modification applications submitted by the Barrows; offering false reasons for unilaterally closing their loan modification application;   falsely informing the Barrows that they should withhold their mortgage payments while their modification application was being considered in order to quickly put them into foreclosure upon denying a loan modification; referring the Barrows to collections activity by JMA when they were current on their mortgage; subjecting their loan first modification application to a "blitz," which is a mass-denial of applications that had aged or where Bank of America had lost borrowers documents; failing to safeguard the Barrow's important documents submitted with their loan modification applications; consistently refusing to timely credit payments to their account; providing conflicting information about how to and for how much to make payments; sending successive conflicting statements regarding the amount owed on the account; causing various

entities and individuals to communicate conflicting information to the Plaintiffs regarding their mortgage, the payments due, the status of the loan modification process; and failing to accurately and timely account for payments made by the Plaintiff; threatening to foreclose and attempting to extract money from the Plaintiffs when they were current on their mortgage or when loan modification applications were pending; causing different representatives to contact Plaintiffs by phone and mail, providing conflicting and inaccurate information; failing to properly and timely evaluate their second loan modification application.

126.    Bank of America's breach of its duty to act in good faith and deal fairly with Plaintiffs breached the Deed of Trust.

127.    Plaintiffs suffered actual damages, including but not limited to, the accrual of default servicing fees and the assessment of late and other fees, including taxes not owed by the Plaintiffs.  They are threatened with additional harm from Defendant's breach because it has not corrected its inaccurate accounting of Plaintiff's account, and has threatened to foreclose despite Plaintiffs' compliance with Bank of America's requests.

128.    To the extent actual damages will not fully and fairly compensate Plaintiffs, they are also entitled to specific performance and other appropriate injunctive relief.

### COUNT TWO: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b)
### (EXPERIAN, TRANS UNION and EQUIFAX)

129.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

130.    Experian, Trans Union, and Equifax each violated 15 U.S.C. §1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the Plaintiffs credit reports and credit files it published and maintained concerning the Plaintiffs.

131.    As a result of Experian's, Trans Union's, and Equifax's violations of 15 U.S.C. §1681e(b) with respect to Mr. Barrow, he suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

132.    As a result of Experian's, Trans Union's and Equifax's violation of 15 U.S.C. § 1681e(b) with respect to Mrs. Barrow, she suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

133.    The violations by Experian, Trans Union, and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Experian, Trans Union, and Equifax were negligent, which entitles the Plaintiffs to recovery under 15 U.S.C. §1681o.

134.    Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, Trans Union, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

### COUNT THREE: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i(a)(1)
### (EXPERIAN, TRANS UNION and EQUIFAX)

135.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

136.    Experian, Trans Union, and Equifax each violated 15 U.S.C. §1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information or delete the item from each of the Barrow's credit files.

137.    As a result of Experian's, Trans Union's, and Equifax's violations of 15 U.S.C. §1681i(a)(1), Mr. and Mrs. Barrow suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

138.    The violations by Experian, Trans Union, and Equifax with respect to Mr. Barrow and Mrs. Barrow were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Experian, Trans Union, and Equifax were negligent, which entitles Mr. Barrow to recovery under 15 U.S.C. §1681o.

139.    Mr. and Mrs. Barrow are each entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, Trans Union, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

### COUNT FOUR: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i(a)(2)(A)
### (EXPERIAN, TRANS UNION and EQUIFAX)

140.    The Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

141. Experian, Trans Union, and Equifax each violated 15 U.S.C. §1681i(a)(2)(A) by failing to provide Bank of America with all the relevant information regarding each Mr. Barrow's and Mrs. Barrow's disputes.

142. As a result of Experian's, Trans Union's, and Equifax's violations of 15 U.S.C. §1681i(a)(2), Mr. and Mrs. Barrow each suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

143. The violations by Experian, Trans Union, and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Experian, Trans Union, and Equifax were negligent, which entitles the Plaintiffs to recovery under 15 U.S.C. §1681o.

144. Mr. and Mrs. Barrow each are entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, Trans Union, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

## COUNT FIVE: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i(a)(4)
### (EXPERIAN, TRANS UNION and EQUIFAX)

145. Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

146. Experian, Trans Union, and Equifax each violated 15 U.S.C. §1681i(a)(4) occasions by failing to review and consider all relevant information submitted by Mr. and Mrs. Barrow.

147.    As a result of Experian's, Trans Union's, and Equifax's violations of 15 U.S.C. §1681i(a)(4), each of the Barrows suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

148.    The violations by Experian, Trans Union, and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Experian, Trans Union, and Equifax were negligent, which entitles each Mr. Barrow and Mrs. Barrow to recovery under 15 U.S.C. §1681o.

149.    Mr. Barrow and Mrs. Barrow are each entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, Trans Union, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

## COUNT SIX: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i(a)(5)(A)
### (EXPERIAN, TRANS UNION and EQUIFAX)

150.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

151.    Experian, Trans Union, and Equifax each violated 15 U.S.C. §1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from each of the Barrow's credit files or modify the item of information upon a lawful reinvestigation.

152.    As a result of Experian's, Trans Union's, and Equifax's violations of 15 U.S.C. §1681i(a)(5)(A), Mr. Barrow and Mrs. Barrow each suffered actual damages,

including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

153.    The violations by Experian, Trans Union, and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Experian, Trans Union, and Equifax were negligent, which entitles the Plaintiffs to recovery under 15 U.S.C. §1681o.

154.    Mr. Barrow and Mrs. Barrow are each entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, Trans Union, and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

### COUNT SEVEN: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)(1)(A)
### (BANK OF AMERICA)

155.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

156.    On at least one occasion within the past two years, by example only and without limitation, Bank of America violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate the Plaintiffs' disputes.

157.    When the Plaintiffs mailed their detailed, written disputes and enclosures to the consumer reporting agencies ("CRAs"), they use a dispute system named, "e-Oscar," which has been adopted by the credit reporting agencies and by their furnisher-customers such as Bank of America.  It is an automated system and the procedures used by the CRAs are systemic and uniform.

158.    When a CRA receives a consumer dispute, it (usually via an off-shore, outsource vendor), translates that dispute into an "ACDV" form.

159.    The ACDV form is the method by which Bank of America has elected to receive consumer disputes pursuant to 15 U.S.C. § 1681i(a).

160.    It is extremely rare – certainly less than 1% of the time – that Bank of America will receive a consumer's dispute sent through the CRAs other than through the e-Oscar system.

161.    On information and belief, the Barrows allege that to date Bank of America has never complained to the CRAs about the amount of information it receives regarding a consumer dispute through the e-Oscar system or through ACDVs.

162.    If Bank of America receives a consumer dispute ACDV form, it is aware that it may also contact the CRA that sent it to obtain more information regarding a consumer's dispute.

163.    Based on the manner in which the CRAs responded to – or did not respond to – each of the Barrow's disputes, representing that Bank of America had "verified" the supposed accuracy of its reporting, Plaintiffs allege that Experian, Equifax and Trans Union did in fact forward the Plaintiffs' dispute via an ACDV to Bank of America.

164.    Bank of America understood the nature of the Plaintiffs' disputes when it received the ACDVs from Experian, Equifax and Trans Union.

165.    When Bank of America received the ACDVs from Experian, Equifax, and Trans Union, it as well could have reviewed its own system and previous communications with the Barrows and discovered that they had made payments on their

mortgage in all the months that they disputed, which months reflected that no payment at all was made on the Plaintiffs' consumer reports.

166.    Notwithstanding the above, Bank of America follows a standard and systemically unlawful process when it receives the ACDV dispute.  Basically, all Bank of America does is review its own internal computer screen for the account and repeat back to the ACDV system the same information Bank of America already had reported to the CRAs.

167.    When Bank of America receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether or not the information already in its computer system is itself accurate.

168.    As a result of Bank of America's violations of 15 U.S.C. §1681s-2(b)(1)(A), the Barrows suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

169.    The violations by Bank of America were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Bank of America was negligent, which entitles the Barrows to recovery under 15 U.S.C. §1681o.

170.    The law in this District, the Fourth Circuit, and even nationally has long ago been articulated to require a detailed and searching investigation by a creditor when it receives a consumer's FCRA dispute through a CRA.

171.    Bank of America was aware of the *Johnson v. MBNA* FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding the Plaintiff's dispute.

172.    Bank of America has been sued numerous times for its alleged failures to conduct lawful FCRA investigations.

173.    On information and belief, the Barrows allege that the procedures followed regarding the Plaintiffs' FCRA disputes through e-Oscar were the procedures that Bank of America intended its employees or agents to follow.

174.    On information and belief, the Plaintiff alleges that Bank of America's employee or agent did not make a mistake (in the way in which he or she followed Bank of America's procedures) when he or she received, processed and responded to the Experian, Equifax, and Trans Union's ACDVs.

175.    On information and belief, the Plaintiff alleges that Bank of America has not materially changed its FCRA investigation procedures after learning of its failures in this case.

176.    The Barrows are entitled to recover actual damages, statutory damages, costs and attorney's fees from Bank of America in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

### COUNT EIGHT: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)(1)(B)
### (BANK OF AMERICA)

177.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

178.    On one or more occasions within the past two years, by example only and without limitation, Bank of America violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer report agencies.

179.    As Plaintiff detailed in Count Seven, Bank of America has elected to use the e-Oscar system for its FCRA disputes received through the CRAs.

180.    Bank of America is aware of the meaning of the several dispute codes used by the CRAs in e-Oscar.

181.    Bank of America does not contend that the ACDV system is an inadequate means to receive FCRA disputes through the CRAs.

182.    Bank of America understood the Barrow's disputes stated that they made mortgage payments in months that Bank of America reported no payments were made and provided proof of payments.

183.    Nevertheless, Bank of America ignored such information and instead simply regurgitated the same identifying information it had previously reported to the CRAs.

184.    As a result of Bank of America's violations of 15 U.S.C. §1681s-2(b)(1)(B), the Plaintiffs suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

185.    The violations by Bank of America were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Bank of America was negligent, which entitles the Plaintiffs to recovery under 15 U.S.C. §1681o.

186.    Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Bank of America in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

### COUNT NINE: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)(1)(C) and (D)
### (BANK OF AMERICA)

187.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint (particularly though not limited to as pled in the "Fact" section of the Complaint and previous Counts).

188.    On one or more occasions within the past two years, by example only and without limitation, Bank of America violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing the Bank of America representations within Plaintiffs' credit files with Experian, Trans Union, and Equifax without also including a notation that this debt was disputed and by failing to correctly report results of an accurate investigation to each credit reporting agency.

189.    Specifically, Bank of America failed to add the "XB" code to the CCC (Compliance Condition Code) field in the ACDV dispute forms when it responded to Experian, Equifax, and Trans Union.

190.    On information and belief, Plaintiffs allege that Bank of America rarely if ever adds the XB code or other notation that an account is disputed when it responds to e-Oscar ACDVs.

191.    Bank of America knew that the Plaintiffs disputed the subject account because they had twice applied for a loan modification, previously and on multiple occasions disputed the debt directly to Bank of America and Bank of America's agents.

192.    The Plaintiff's dispute was, at a minimum, *bone fide*.

193.    In fact, the Plaintiffs' dispute were justified because they had made mortgage payments at times that Bank of America and the CRAs reported no payments had been made and showed arrearages when the Barrows were not delinquent or in default.

194.    Bank of America was aware of the *Saunders v. B.B. & T.* FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding the Plaintiff's dispute.

195.    Bank of America has been sued multiple times for its alleged failures to note its account as disputed when responding to a FCRA dispute.

196.    On information and belief, the Plaintiff alleges that the procedures followed regarding the Plaintiff's FCRA disputes through e-Oscar were the procedures that Bank of America intended its employees or agents to follow.

197.    On information and belief, the Plaintiffs allege that Bank of America's employee or agent did not make a mistake (in the way in which he or she followed Bank of America's procedures) when he or she received, processed and responded to the Experian, Equifax, and Trans Union's ACDVs and did not include the XB code in the CCC field.

198.    On information and belief, the Plaintiffs allege that Bank of America has not materially changed its FCRA investigation procedures regarding the CCC field in ACDVs after learning of its failures in this case.

199.    As a result of Bank of America's violations of 15 U.S.C. §1681s-2(b)(1)(C) and (D), the Plaintiffs suffered actual damages, including but not limited to:

loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

200.    The violations by Bank of America were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Bank of America was negligent, which entitles the Barrows to recovery under 15 U.S.C. §1681o.

201.    The Barrows are entitled to recover actual damages, statutory damages, costs and attorney's fees from Bank of America in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

### COUNT TEN: VIOLATION OF REAL ESTATE AND SETTLEMENT PROCEDURES ACT 12 U.S.C. § 2605(e) (BANK OF AMERICA)

202.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

203.    On one or more occasions within the past two years, by example only and without limitation, Plaintiffs made a qualified written request to Bank of America insisting that it conduct an investigation to correct inaccurate account information, inaccurate credit reporting, inaccurate charges to their account, and to provide information regarding their loan.

204.    Plaintiffs each made qualified written requests in May and August of 2013. Plaintiff's written communications were sent to the address at which they were instructed to send such requests by Bank of America.

205.   Bank of America stated that it did not consider the Barrow's request to be proper subjects of qualified written requests and addressed only the questions or provided documents that it deemed relevant.

206.   Bank of America purposely misconstrued or misstated the purpose of the Barrow's QWRs to contest the terms of the Note and Deed of Trust.

207.   Bank of America violated the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e), by:

   a.   Failing to timely conduct an appropriate investigation of Plaintiffs' inquiries;

   b.   Failing to conduct any investigation whatsoever regarding Plaintiffs' inquiries;

   c.   Failing to timely provide Plaintiffs with a true and accurate written explanation or clarification of the Plaintiff's legitimate questions regarding his loan;

   d.   Continuing to report information regarding allegedly overdue payments to the national credit bureaus.

208.   As a result of Bank of America's violations of 12 U.S.C. § 2605(e), the Plaintiffs suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

209.   Bank of America is liable for actual damages in an amount to be determine by the Court pursuant to 15 U.S.C. § 2605(f).

210.   Bank of America's conduct appears to be a pattern and practice of misconduct with many consumers. Plaintiff has been a victim of this pattern of

misconduct. For each violation of 12 U.S.C. § 2605(e), Bank of America is also liable to Plaintiff for additional damages up to $1,000 per violation.

211.    Plaintiff is also entitled to recover costs and attorneys' fees from Bank of America in an amount to be determined by the Court pursuant to 12 U.S.C. § 2605(f)(3).

## COUNT ELEVEN: VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT
### 15 U.S.C.§ 1692e(11)
### (J.M. ADJUSTMENT SERVICES, LLC)

212.    Plaintiffs reallege and incorporate all of the factual allegations of the Complaint.

213.    JMA violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(11) by failing to disclose in its uses of orange door hangers that the communication is from a debt collector; that it is attempting to collect a debt and that any information obtained would be used for that purpose.

214.    As a result of JMA's violations of the FDCPA, the Plaintiffs suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation and other mental and emotional distress.

215.    The Plaintiffs are each entitled to actual and statutory damages against JMA, and reasonable attorneys fees and costs under 15 U.S.C. § 1692k. Plaintiffs reallege and incorporate all of the factual allegations of the Complaint.

## COUNT TWELVE: VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT
### 15 U.S.C. § 1692g(a)(2)
### (J.M. ADJUSTMENT SERVICES, LLC)

216.    Plaintiffs reallege and incorporate all of the factual allegations of the Complaint.

217.   JMA violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692g(a)(1) by failing to disclose in its May 21, 2013, "Notice" to the Barrows the true identity of the creditor to whom the alleged debt is owed or the true amount of the debt that is owed.

218.   As a result of JMA's violations of the FDCPA, the Plaintiffs suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation and other mental and emotional distress.

219.   The Plaintiffs are each entitled to actual and statutory damages against JMA, and reasonable attorneys fees and costs pursuant to 15 U.S.C. § 1692k.

WHEREFORE, Plaintiffs each demand judgment for actual, statutory and punitive damages against Defendants, jointly and severally; for their attorneys' fees and costs; for prejudgment and post-judgment interest at the judgment rate; specific performance and injunctive relief; and such other relief the Court deems just and proper.


**TRIAL BY JURY IS DEMANDED**

Respectfully Submitted,
Jimmie L. Barrow and Eleanor R. Barrow


By   _Susan M Rotis_
     Counsel


Leonard A. Bennett, VSB#37523
Susan M. Rotkis, VSB#40693
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd. 1-A
Newport News, VA 23601
(757) 930-3660 – Telephone
(757) 930-3662 – Facsimile